## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

```
DAVID A. SCOTT, JR.,              )
                                  )
    Plaintiff,                    )
                                  )
vs.                               )
                                  )    NO. 2:14-CV-107
LEAR CORPORATION,                 )
                                  )
    Defendant.                    )
```

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Lear Corporation on January 31, 2017 (DE #99). For the reasons set forth below, this motion is **GRANTED** and this case is **DISMISSED WITH PREJUDICE.**

BACKGROUND

David A. Scott, Jr. ("Scott") was employed by Lear Corporation ("Lear") from October 2010 until his termination on April 23, 2013. Approximately a year after his termination, he filed the instant law suit *pro se*, naming Lear and several individuals as defendants. He alleges violations of the Americans with Disabilities Act (42 U.S.C. § 12101), Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-5), and wrongful termination. This Court previously dismissed the individual defendants (DE #33), leaving only Lear as a defendant.

Lear filed the instant motion on January 31, 2017.  Lear also served Scott with a "Notice of Summary Judgment Motion" that explained what a summary judgment motion is and his obligations in response to the motion. (DE #102). The notice explained that factual allegations must be supported with citations to the evidence, and that the court is not required to consider materials that are not cited.  Despite this notice, Scott filed a nine page response to the instant motion devoid of any citations.  He also provided over 400 pages of exhibits.  Lear filed a reply brief on March 20, 2017, and the motion is now ripe for adjudication.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.  To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most

favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

A party opposing a properly supported summary judgment motion may not rely on allegations in her own pleading but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). If the nonmoving party fails to establish the existence of an essential element on which she bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

Because Scott's response is without citations to the evidence, the well-supported facts presented by Lear are undisputed and will be accepted as true. The facts[1] are as follows:

---

[1] Having verified that the cited evidence supports each of the facts presented in Lear's brief, the facts presented here are borrowed from the brief (DE #100) with only minor alterations.

<u>Background</u>

Lear is an automotive supplier. Lear employed Scott at its Hammond, Indiana facility. (Def. Ex. 1: Scott Dep. I at 23; Def. Ex. 2: Scott Dep. II at 12).[2] UAW Local 2335 ("UAW") represents the facility's hourly bargaining unit employees such as Scott. (Scott Dep. II at 19, 21). Lear and the UAW were parties to a collective bargaining agreement entered into on September 12, 2009. (Def. Ex. 4). The bargaining unit employees were subject to Lear's no-fault attendance policy. (Def. Ex. 5). Scott received a copy of that policy. (Def. Ex. 6).


<u>Scott Receives Permanent Work Restrictions</u>

Scott began his employment with Lear in October 2010. (Scott Dep. I at 23; Scott Dep. II at 12). In February 2011, Scott reported to Lear that he injured his finger. (Scott Dep. I at 29). In March or April 2011, Scott reported that his feet were hurting. (Scott Dep. I at 33). Scott went to the doctor in June 2011 for his feet, but was not placed on any work restrictions. (Scott Dep. I at 34-35). In May 2011, Scott alleged that he hurt his shoulder while working at Lear. (Scott Dep. I at 35; Scott Dep. II at 13). On

---

[2] Scott has provided deposition testimony relevant to this case on three occasions. "Dep. I" refers to the deposition transcript from the February 24, 2016, deposition. "Dep. II" refers to the deposition transcript from the March 29, 2016, deposition. "Dep. III" refers to the deposition transcript from the July 16, 2013, deposition.

July 11, 2011, Scott filed a worker's compensation claim for the shoulder injury he suffered in May 2011. (Scott Dep. I at 42; Def. Ex. 7). On November 14, 2011, after performing a functional capacity evaluation, Dr. Joseph Schwartz put Scott on permanent restrictions consisting of "light physical demand level with 20 pounds of occasional lifting, 10 pounds of frequent lifting, and negligible constant lifting." (Scott Dep. I at 44; Def. Ex. 8).

### Scott's Leave of Absence

In December 2011, Scott applied for and received leave under the Family and Medical Leave Act for Achilles tendinitis. Concurrent with his leave, he applied for and received short-term disability benefits. (Scott Dep. I at 47-48; Scott Dep. II at 14-15). Scott's leave of absence began on December 20, 2011, and ended on August 29, 2012. (Scott Dep. I at 48; Scott Dep. II at 15).

### Scott's Work at Lear from August 29, 2012 – November 28, 2012

Scott returned to work from his leave of absence on August 29, 2012. (Scott Dep. I at 48, 82; Scott Dep. II at 15). Scott did not have any restrictions stemming from his Achilles tendinitis. (Scott Dep. I at 82-83). However, the November 2011 permanent restrictions issued by Dr. Schwartz remained in place. (*Id.*).

On his first day back on August 29, 2012, Lear assigned Scott to a job steaming seats that was similar to a job he had previously performed. (Scott Dep. I at 83-84). He performed no other job that day. (Def. Ex. 3: Scott Dep. III at 59). As Scott admitted, that job "was within my restrictions" and it was "easy for me to do." (Scott Dep. II at 182; Scott Dep. III at 57). At the end of his shift, his right shoulder felt "fine," and on a zero to ten pain scale, his level of pain was "zero." (Scott Dep. III at 59).

On August 30, 2012, Scott initially worked on the job steaming seats that he performed on August 29, 2012. (Scott Dep. I at 87-88). He next worked on a job that had "something to do with the bolts." (*Id.* at 90). Scott had no issue with performing this job. (*Id.* at 91). After an hour or two, Scott returned to the job steaming seats. (*Id.*). Scott was later moved to a job applying leather covers to headrests. (*Id.* at 89). He described the task as follows:

> I had to take the leather and put it on a ball which you press on the lever and it releases steam and it's supposed to loosen up the leather. And then I have to put the leather on the headrest and snap it closed.

(*Id.*). There were also "some kind of clamps" that Scott had to close down. (*Id.* at 90). Finally, there was a lever that made the seat lay down. (*Id.*). Scott performed no other jobs on August 30, 2012. (*Id.* at 91). Scott asked Dianne Jewell, the Health and Safety Manager, if the job was consistent with his permanent work

restrictions. (Scott Dep. I at 88-89). Jewell indicated it was within his restrictions. (*Id.* at 89, 92-93).

At the end of his shift, Scott reported that his right arm was swollen and his back was sore. (Scott Dep. I at 94-96). He asked Jewell for an Incident Report. (*Id.* at 94). Scott filled out the Incident Report and gave it to Jewell. (Scott Dep. I at 96-97; Def. Ex. 9). Jewell then sent Scott to the medical clinic to treat his injuries. (Scott Dep. I at 97-98). The medical clinic put Scott off work and directed him to see Dr. Schwartz. (*Id.* at 103).

In early September 2012, Monica Holt, the then Assistant Human Resources Manager, and Jewell met with Scott and UAW Vice President Bill Behr to discuss his return to work. (Scott Dep. I at 52, 105-107, 109). In that meeting, Scott received a copy of a September 5, 2012, letter from Jewell confirming that Lear had work available within his restrictions and that he should report to work the next day. (Def. Ex. 10; Scott Dep. I at 106). Although Scott contends he showed them a doctor's note placing him off work, he admitted neither Jewell nor Holt excused him from returning to work. (Scott Dep. I at 107-08). On September 20, 2012, Scott received another letter from Jewell that again confirmed that Lear had work available within his restrictions and directed him to report to work. (Def. Ex. 11; Scott Dep. I at 109). Despite these

directives, Scott did not report to work in September or October. (*Id.* at 109, 116).

On October 31, 2012, Dr. Schwartz examined Scott and, according to Scott, told him he could not work until he had an MRI. (Scott Dep. I at 116, 118). He also provided Scott with a note keeping him off work. (Scott Dep. I at 118; Def. Ex. 12).

On November 12, 2012, Scott received an email from Barbara Sacha ("Sacha"), the then Human Resources Manager, advising him that Lear had the "ability to accommodate the work restrictions that were set forth by Dr. J. Schwartz." (Scott Dep. I at 118-120; Def. Ex. 13). It was at that time that Scott learned that Dr. Schwartz had amended his earlier work restrictions and had released him to light duty work with the following limitations "no use of Right Arm." (Scott Dep. I at 118, 120; Def. Ex. 14). Sacha advised Scott to report to work on the following day. (Def. Ex. 13).

Scott reported to work on November 13, 2012. (Scott Dep. I at 125). Scott worked on November 13, 14, 15, 19, 20, 21, 26, and 27, 2012. (*Id.* at 127). During his first week back to work, there was no work for Scott and he sat in the cafeteria. (*Id.* at 127-28). During his second week, Scott wiped down tables. (*Id.* at 129). On November 26 and 27, Scott sorted bolts in the tool crib. (*Id.*). On November 27, 2012, Jewell advised Scott in the presence of his UAW representative that Lear had work available within his restrictions and if he chose to go home, he would receive an

attendance point under Lear's attendance policy. (Scott Dep. I at 130-31; Def. Ex. 15). That same day, Scott informed Jewell that he needed to see the doctor because he was having sharp pain in his neck, and he needed something for the pain. (Scott Dep. I at 131). Jewell told Scott to contact the worker's compensation nurse. (*Id.*). Scott's last day at work was November 27, 2012. (Scott Dep. II at 19). After that day, he stopped coming to work. (*Id.*).

On December 3, 2012, Scott treated with Dr. Jeff Staron. (Scott Dep. I at 132). At that appointment, Dr. Staron told Scott that he could work with restrictions of "no use of the right arm," but he did not provide Scott with a document containing this restriction. (Scott Dep. I at 132-33). On December 10, 2012, Scott picked up a Work Restriction Form from Dr. Staron that contained a work restriction that differed from the one they discussed on December 3, 2012. Instead of no use of right arm, the form provided the following:

> • Restrictions: No overhead work with right arm, no lifting over 10 lbs with right arm.

> • Restrictions to be in place until follow up in 6 weeks in our office.

(Scott Dep. I at 138; Def. Ex. 16).

On December 11, 2012, Sacha sent Scott a letter advising him that Dr. Schwartz had released Scott to return to work and that Lear could accommodate his restrictions. (Def. Ex. 17; Scott Dep. I at 133). Scott did not return to work but rather sent an e-mail

to Sacha on December 13, 2012, stating that he went to see "another specialist[]" and that he "told me no lifting with my right [sic] and six weeks of physical therapy . . . . So at this time Barbara Sacha I am on pain and inflammation medication and no lifting with my right [sic] and six weeks of physical therapy so that's why I'm unable to work at this present time . . . ." (Scott Dep. I at 134; Def. Ex. 18).

On December 17, 2012, Holt e-mailed Scott a letter informing him as follows:

> Lear Corporation is in receipt of your e-mail dated 12/13/2012. In your e-mail, you indicate that you are currently receiving treatment from another physician. In accordance with the letter sent to you … [on] December 11, 2012, it is your responsibility to provide documentation from your attending physician substantiating your absence. See Collective Bargaining Agreement language inserted below….

(Scott Dep. I at 135; Def. Ex. 19).

The letter quoted the medical leave of absence provision in Article 13, § 3 of the CBA which provided in pertinent part:

> An employee requesting a Medical Leave of Absence must provide documentation from his/her attending physician which states the date the disability began, the medical basis for the disability, and the expected date the employee can reasonably be expected to return to work.

(Def. Ex. 4).

That same day, Scott emailed Holt with his response. (Scott Dep. I at 147; Def. Ex. 20). Scott disclosed that he had seen another doctor who had restricted him from working.

> At this point I am still unable to lift or do anything with my right limb and the doctor has me on some pain medication and 6 weeks of physical therapy . . . . I can call you tomorrow 12-18-12 to discuss what's next but as of now I still can't use my right hand and I'm taking pain medication . . . .

(Def. Ex. 20).

On January 7, 2013, Scott's friend, Deandra Jones, dropped off an envelope containing Dr. Staron's medical records. (Def. Ex. 21; Scott Dep. I at 149-50). Although Scott had driven with Jones to the Hammond facility, he did not enter the facility with her. (Scott Dep. I at 153; Scott Dep. III at 40). Patrice Tarver, the then Human Resources Specialist, received the envelope from Jones. (Def. Ex. 22: Verified Statement of Patrice Tarver at ¶ 3-4). Scott contends that the records he gave to Jones included Dr. Staron's December 3, 2012, Work Restriction Form. (Scott Dep. I at 154-55). However, Tarver reviewed the contents of the envelope and determined it solely contained a three page medical report from Dr. Staron. (Tarver Ver. Statement at ¶ 4). The envelope did not contain any documents describing work restrictions, including the Work Restrictions Form. (*Id.*). Tarver delivered the document to Sacha or Holt. (*Id.* at ¶ 5). According to the medical report that Jones dropped off, Dr. Staron examined Scott on December 3,

2012. (Def. Ex. 21). It did not mention the restrictions contained in the Work Restrictions Form and it did not put Scott off of work for any period of time. (*Id.*).

Lear Terminates Scott's Employment Effective April 23, 2013

On April 18, 2013, Jones delivered Dr. Staron's Work Restriction Form to Scott's workers' compensation attorney who, in turn, delivered the form to Lear's workers' compensation attorney. (Scott Dep. I at 158-59). On April 19, 2013, Lear received a copy of the form. (Def. Ex. 23). This form was not included in the envelope that Tarver received from Jones or the records that Sacha received and reviewed from Tarver. (Tarver Ver. Statement at ¶ 5).

Effective April 23, 2013, Lear terminated Scott's employment. (Def. Ex. 23). Scott received a copy of the April 23, 2013, termination letter. (Scott Dep. I at 159-60). In the letter, Sacha advised Scott that Lear had discharged him because: (1) he did not submit evidence substantiating his need to be off work after November 27, 2012; and (2) he did not report to work after that date, even though both Dr. Schwartz and Dr. Staron had released him to return to work with restrictions and Lear had told him it would accommodate his restrictions. (Def. Ex. 23). Aside from some emails he exchanged with Holt in early January 2013 prior to Jones dropping off the medical records and the April 23, 2013,

termination letter, Scott had no contact with Sacha or Holt in 2013. (Scott Dep. I at 157-60).

### The UAW files a grievance on behalf of Scott

Article 5 of the CBA has a three step grievance procedure. (Def. Ex. 4). If the grievance is not settled at Step 3, the UAW may appeal to arbitration. (*Id.*). The parties may also mutually agree to binding mediation through the Federal Mediation Conciliation Service. (*Id.*).

On April 24, 2013, the UAW filed a grievance protesting Scott's discharge. (Def. Ex. 24). Scott received a copy of the grievance. (Scott Dep. II at 156). On September 6, 2013, Lear denied the grievance at Step 3 of the grievance procedure. (Def. Ex. 25). In March 2014, Lear, the UAW, and Scott participated in binding mediation. (Scott Dep. II at 160-61). Scott contends he did not agree to binding mediation. (Scott Dep. II at 165-66). Scott met with the UAW in advance of the mediation and reviewed with it some of the documents he wished to present at the mediation. (*Id.* at 161-62). At the mediation, Scott testified and communicated his position as to why Lear should not have discharged him. (*Id.* at 161). He also was able to introduce some, but not all, of his documents into evidence. (*Id.* at 162). The mediator issued a decision denying the grievance. (*Id.* at 170, 172). On April 25 or 26, 2014, Scott received a letter from the UAW advising

him that, given the outcome of the mediation, the UAW had withdrawn the grievance and would not be taking any further action. (Def. Ex. 26; Scott Dep. II at 172).

Scott's EEOC Charge

Scott filed EEOC Charge #470-2013-02513 on August 11, 2013. (Def. Ex. 27). Scott also submitted to the EEOC an Intake Questionnaire. A fax line that appears on one copy of the Intake Questionnaire is dated June 6, 2013. (Def. Ex. 28). The EEOC time stamped another copy of the Intake Questionnaire as received July 16, 2013. (Def. Ex. 29). In the Charge, Scott alleged "sex discrimination," "disability discrimination," and "retaliation." (Ex. 27). The EEOC dismissed the Charge and issued Scott a right to sue letter on March 19, 2014. (Def. Ex. 30).

ANALYSIS

Scott's Harassment Claim is Barred for Failure to Exhaust

Scott's complaint alleges harassment, but he did not allege harassment in his EEOC charge. (Def. Ex. 27). "Title VII does not authorize the filing of suit until the plaintiff has exhausted his administrative remedies." *See Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003). Scott did not present this claim to the EEOC and did not exhaust his administrative remedies. Furthermore, Scott has offered no argument in response to Lear's

assertion that the harassment claim is barred.  Accordingly, it must be dismissed.

### Scott's Title VII and ADA Claims are Limited to Events on or After August 10, 2012

In Indiana, an EEOC charge "must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). Although the Charge is dated August 11, 2013, there is an Intake Questionnaire dated June 6, 2013.  Even if the earlier date is used as the date Scott filed his Charge, his ADA and Title VII claims are limited to claims based on events occurring on or after August 10, 2012.  This includes Scott's allegation that Lear failed to accommodate his disability prior to his December 2011 medical leave.  Once again, Scott has offered no argument in response to Lear's assertion that claims based on acts prior to August 10, 2012, are barred.  Accordingly, any claims based on acts prior to August 10, 2012, will be dismissed.

### Scott's ADA Claim for Failure to Accommodate Fails

Under the ADA, as amended by the ADA Amendments Act of 2008, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an

otherwise qualified individual with a disability" who is an employee, unless the employer can "demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005)(citation omitted).

Scott alleges that, following his return to work on August 29, 2012, Lear failed to reasonably accommodate his disability. More specifically, he alleges that Lear assigned him to a job installing leather on headrests and that job was inconsistent with his permanent restrictions because it required use of his right arm. (Scott Dep. I at 92). His permanent restrictions, however, did not address pulling or pushing and did not prevent him from using his right arm. It was not until November of 2012 that Scott received a restriction that he not use his right arm. (Def. Ex. 14). That restriction was accommodated by having Scott sit in the cafeteria, wipe tables, and sort bolts. (Scott Dep. I at 125-29).

Scott also asserts that Lear would not permit him to return to work. The evidence shows that Lear repeatedly instructed Scott

to return to work because they had work that would accommodate his disability.  (Def. Exs. 10, 11, 13, 17, 19).

In response to the instant summary judgment, Scott has produced no evidence that Lear failed to accommodate his disability, failed to provide medical care, or told him he could not return to work.  Accordingly, Scott's ADA failure to accommodate claim fails.

### Scott's Sex Discrimination Claims Fail

Title VII prohibits employers from firing or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  *See* 42 U.S.C. §§ 2000e-2(a)(1).  To prevail on his sex discrimination claim, Scott must demonstrate a causal link between his gender and an adverse employment action.

The legal standard to be applied "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case

by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

Scott alleges that female employees received preferential treatment, but he cannot bring a pattern-or-practice claim. Pattern-or-practice claims are limited to class actions. *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014). Although Scott's charge and complaint do not set forth the basis for his sex discrimination claim, he alleged during his deposition that Lear discriminated against him based on his sex with respect to medical attention and placing him in a job outside his restrictions. He has, however, failed to support these allegations with evidence. Because there is no evidence before this Court from which a reasonable jury could find that Scott's sex was a factor in any adverse employment action, this claim must be dismissed. *See Ortiz*, 834 F.3d at 765.

<u>Scott's Retaliation Claim Fails</u>

Both the ADA and Title VII prohibit an employer from retaliating against an employee because the employee has opposed a practice that violates the statute. For Scott's retaliation claims to survive summary judgment, he must offer evidence that he engaged in statutorily protected activity, suffered a materially adverse employment action, and that a causal connection exists between the protected activity and the adverse employment

action.  *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).  To show a causal connection, Scott must produce some evidence that the defendant "would not have taken the adverse … action but for [his] protected activity." *Id.* (internal quotations and citations omitted).

Lear terminated Scott on April 23, 2013.  Scott contends that the decision to terminate him was the result of his complaints in 2011 that Lear treated female employees more favorably than males and his complaint in September 2012 that Lear had not complied with his work restrictions.  Scott has produced no evidence to support these claims.  The timing of the events is not so close that it allows an inference that the termination was the result of protected activity.  *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)("suspicious timing will rarely be sufficient in and of itself to create a triable issue.")(internal quotations and citations omitted).  Scott has pointed to no similarly situated employee that was treated more favorably.  Further, he has produced no evidence that Lear's stated reason for terminating his employment was pretextual.  Based on the facts before this Court, no reasonable jury could find in Scott's favor on his retaliation claims, and they will be dismissed.

<u>Scott's Wrongful Discharge Claim Fails</u>

This Court previously found that Scott's wrongful discharge claim is a hybrid claim under section 301 of the LMRA, 29 U.S.C. § 185(a). (DE #33 at 14). To prevail on this claim, Scott "must have a meritorious claim against both the union and the employer." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003). In response to the instant summary judgment motion, Scott has not produced evidence that would establish he has a meritorious claim against either Lear or the union.

The CBA provides that Lear may discharge an employee for just cause. (Def. Ex. 4, Art. 3, Section 2). Here, Lear asserts that it had just cause to discharge Scott because he did not submit evidence supporting his claim that he needed to be off work after November 27, 2012, and he did not report to work after that date even though his treating physicians had released him to return to work and Lear expressed a willingness to accommodate the restrictions set by his physicians. In support of its summary judgment motion, Lear has produced evidence supporting its assertion that Scott was discharged for just cause, and Scott has produced no evidence to the contrary. Accordingly, this claim must fail.

Additionally, this claim fails because, based on the evidence properly before this Court, no reasonable jury could find that UAW breached its duty of fair representation. A union breaches its

duty of fair representation where it acts arbitrary, discriminatory, or in bad faith. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). In response to the instant summary judgment motion, Scott has produced no evidence that the union acted outside the range of reasonableness or that any union official's motives were improper. Therefore, Scott's wrongful discharge claim fails.


CONCLUSION

For the reasons set forth below, Lear's Summary Judgment motion (DE #99) is **GRANTED** and this case is **DISMISSED WITH PREJUDICE.**

**DATED: September 27, 2017**                    **/s/RUDY LOZANO, Judge**
                                                                    **United States District Court**